# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 15-522

STATE OF LOUISIANA

VERSUS

## WOODROW KAREY, JR.  A/K/A WOODROW KAREY, II

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 17151-14
HONORABLE CLAYTON DAVIS, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## JIMMIE C. PETERS
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Jimmie C. Peters, and Marc T. Amy, Judges.

## MOTION TO SUPPLEMENT DENIED; REVERSED AND REMANDED.

COOKS, J., dissents and assigns written reasons.

**John F. DeRosier**
**District Attorney**
**Carla S. Sigler**
**Assistant District Attorney**
**Fourteenth Judicial District**
**901 Lakeshore Drive, Suite 800**
**Lake Charles, LA 70601**
**(337) 437-3400**
**COUNSEL FOR APPELLANT:**
     **State of Louisiana**

**Adam P. Johnson**
**Todd S. Clemons**
**Johnson & Vercher, L.L.C.**
**P. O. Box 849**
**Lake Charles, LA 70602**
**(337) 433-1414**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**Woodrow Karey, Jr.**

**PETERS, J.**

The State of Louisiana (state) appeals the trial court's grant of a motion to quash, thereby dismissing the charge of second degree murder against the defendant, Woodrow Karey, Jr., also known as Woodrow Karey, II. For the following reasons, we deny the state's request to supplement the record, reverse the trial court's grant of the motion to quash, reinstate the grand jury indictment for second degree murder, and remand the matter to the trial court for further proceedings.

## DISCUSSION OF THE RECORD

The defendant is accused of walking into the Tabernacle of Praise Church in Lake Charles, Louisiana, on September 27, 2013, and killing the church's pastor, Ronald Harris, Sr. On June 26, 2014, a grand jury indicted the defendant for the offense of second degree murder, a violation of La.R.S. 14:30.1. However, at the time of this grand jury indictment, the defendant was already under an indictment returned by a different grand jury for the offense of manslaughter, a violation of La.R.S. 14:31. The manslaughter indictment had been returned on November 14, 2013. Furthermore, in both indictments, the victim was the same Ronald Harris, Sr. who died in his church on September 27, 2013. The indictments were assigned different docket numbers and have been treated as two completely separate proceedings. On July 28, 2014, the defendant appeared in the trial court for arraignment on the charge of second degree murder, entered a not guilty plea, and requested a jury trial. On July 30, 2014, the state *nolle prossed* the manslaughter charge.

On August 8, 2014, the defendant filed a motion to quash the second degree murder charge, but filed the motion under the docket number assigned to the then-dismissed manslaughter charge and not the docket number assigned to the second

degree murder proceeding. The defendant based his motion on the argument that the state and the defendant had entered into an agreement that both would be bound by whatever charge or charges the first grand jury returned, and that the state violated that agreement by taking the matter back to another grand jury and obtaining an indictment for a more serious charge. The trial court heard the motion on January 6, 2015. The next day, the trial court filed its written ruling, with reasons, granting the defendant's motion to quash and dismissing the second degree murder indictment.

## OPINION

### Motion to Supplement the Record

After perfecting its appeal in the trial court, the state filed a motion to supplement the record in this court, and to extend the briefing schedule then in place. With regard to supplementing the record, the state sought to have Docket Number 26060-13 made part of the appellate record now before us. We find no merit in the motion.

Although some documents from Docket Number 26026-13 found their way into the record in Docket Number 17151-14, neither party moved in the trial court to introduce the earlier record in the later one. Strictly speaking, the materials filed under one docket number should not be included in an appellate record when the pertinent motion for appeal does not bear the docket number of the materials at issue. Louisiana Code of Criminal Procedure Article 917 provides, in pertinent part, that "[t]he clerk of the trial court shall prepare the record in accordance with the rules of the appellate court." Additionally, Uniform Rules—Courts of Appeal, Rule 2-1.7 states in pertinent part:

> No record of another case (or prior record in the same titled and numbered case) shall be included in the record, unless such other record has been introduced in evidence (at trial) in the case on appeal

2

or on writs, in which event such other record shall accompany the record as an exhibit.

For the foregoing reasons, we decline to grant the state the requested relief.

### Assignment of Error

In its sole assignment of error on appeal, the state asserts that the trial court erred in granting the motion to quash and in dismissing the grand jury indictment for second degree murder. While the state asserts only one assignment of error, it breaks that assignment down into three different segments, and we will consider each segment separately.

#### *Timeliness of the defendant's motion to quash*

The state first asserts that the defendant did not timely file his motion to quash because he filed it in the dismissed manslaughter proceeding and not in the second degree murder proceeding.

Louisiana Code of Criminal Procedure Article 535 provides the time limitations associated with the filing of a motion to quash. That article provides that a motion to quash may be filed of right, at any time before the commencement of trial in eight situations: seven are listed in La.Code Crim.P. art. 535(A); and one is listed in La.Code Crim.P. art. 535(B). Additionally, the seven grounds listed in La.Code Crim.P. art. 535(A) "may be urged at a later stage of the proceedings in accordance with other provisions of [the Louisiana Code of Criminal Procedure]." Motions to quash addressing any other ground "shall be filed in accordance with Article 521." La.Code Crim.P. art. 535(C). Finally, La.Code Crim.P. art. 535(D) provides that "[t]he grounds for a motion to quash under Paragraphs B and C are waived unless a motion to quash is filed in conformity with those provisions."

Louisiana Code of Criminal Procedure Article 521(A) provides that "[p]retrial motions shall be made or filed within fifteen days after arraignment,

3

unless a different time is provided by law or fixed by the court at arraignment upon a showing of good cause why fifteen days is inadequate." That fifteen-day time limitation may be extended by the trial court "[u]pon written motion at any time and a showing of good cause" for the extension. La.Code Crim.P. art. 521(B).

The state arraigned the defendant on the second degree murder indictment on July 28, 2014, and the defendant filed his motion to quash on August 8, 2014, or within fifteen days of the defendant's arraignment. Thus, had the motion been filed in the correct proceeding, there is no question but that it would have been timely pursuant to La.Code Crim.P. art. 535(C).

The state argues on appeal, however, that the motion was not timely because it was filed in the dismissed proceeding and, therefore, was never properly before the trial court. In opposition, the defendant asserts that the state's argument on this issue is not properly before the court because the state did not object in the trial court proceedings and, therefore, the trial court was not required to and did not address the issue. Additionally, the defendant argues that neither judicial economy nor the interests of justice would be served with a dismissal or remand because all of the parties were aware that the motion was to be heard on January 6, 2015, and the trial court held a full hearing on the motion.

The record establishes that not only did the defendant file his motion to quash in the previously dismissed manslaughter proceeding, but he never corrected this error by filing a new motion or a certified copy of the improperly filed motion in the proper proceeding. However, the record also reflects that at all times, the state, the defendant, and the trial court treated the motion as if it had been filed in the second degree murder proceeding. Given the fact that the state failed to object at the trial on the motion, the issue is not properly before us, and we reject this

4

portion of the state's assignment of error.  La.Code Crim.P. art. 841; Uniform Rules—Courts of Appeal, Rule 1-3.

### *Statutory basis for the defendant's motion to quash*

The state next asserts that the defendant's motion to quash is improper because it is not based on any of the grounds upon which a motion to quash can be based under the law, including specifically La.Code Crim.P. arts. 532, 533, and 534.  We agree that the basis for the motion is not one of those enumerated grounds for the filing of a motion to quash as found in the appropriate provisions of the Louisiana Code of Criminal Procedure.  However, we find no merit in the argument that the defendant's motion is not otherwise supported in law.

Louisiana Code of Criminal Procedure Article 532 provides the general grounds for granting a motion to quash; La.Code Crim.P. art. 533 provides special grounds particular to quashing a grand jury indictment; and La.Code Crim.P. art. 534 provides special grounds particular to quashing a bill of information.  None of these articles address a situation wherein a defendant challenges a criminal prosecution based on the validity of a pretrial agreement.  Thus, the state is correct in its assertion that no article in the Louisiana Code of Criminal Procedure provides the defendant with the relief he is seeking in this matter.

Despite the lack of direct statutory relief, the supreme court in *State v. Perez*, 464 So.2d 737, 739 (La.1985), held that "[t]he motion to quash is essentially a mechanism by which to raise pre-trial pleas of defense, i.e., those matters which do not go to the merits of the charge."  Additionally, in *State v. Franklin*, 13-1489, p. 9 (La.App. 4 Cir. 6/11/14), 147 So.3d 231, 239, *writ denied*, 14-1326 (La. 2/13/15), 159 So.3d 460, the fourth circuit recognized that "judicial enforcement of [an] agreement not to prosecute was properly sought through the filing of a motion to quash."  The fourth circuit further held that while La.Code Crim.P. arts 532 and

534 do not include "the enforcement of agreements not to prosecute" as a ground upon which a motion to quash may be based, the examples set forth in those articles "are merely illustrative and far from exhaustive." *Id.* at 239. We recognize the rationale set out by the fourth circuit and conclude that a motion to quash is the proper vehicle to enforce an agreement not to prosecute. We reject this portion of the state's assignment of error as well.

### *Agreement between the parties*

Finally, the state argues that it had no agreement with the defendant that would have prevented it from pursuing additional or enhanced charges against him. The evidence before the trial court on this issue included a number of exhibits and the testimony of four lawyers: John DeRosier, the district attorney for the Fourteenth Judicial District; Hugo Holland, an assistant district attorney for the Fourteenth Judicial District; Brett Sandifer, a former assistant district attorney for the Fourteenth Judicial District; and Todd Clemons, one of the defendant's legal counsel.

Mr. DeRosier testified that he did not directly participate in the presentation of evidence to either grand jury or in the prosecution of the defendant thereafter; and he expressed an extremely limited recollection of his personal involvement in the litigation. The defendant asserts that Mr. DeRosier participated in two telephone conversations with the defendant's legal counsel wherein a discussion of the purported agreement occurred: The first on October 30, 2013, when Mr. DeRosier was in his office with Mr. Holland and Mr. Sandifer; and the other the next evening as Mr. DeRosier cooked dinner at his home.[1] Mr. DeRosier recalled

---

[1] According to Mr. DeRosier, these two assistant district attorneys were assigned to try the matter.

part of the home conversation, but remembered nothing of the office conversation or the fact that it even occurred.[2]

According to Mr. DeRosier, he informed Mr. Clemons during the home telephone conversation that "[b]ecause of the nature of this case, it had to go to [the] Grand Jury[,]" and that the state would allow the defense team to present any witnesses they "deemed appropriate" at the grand jury proceeding. Mr. DeRosier did not recall telling Mr. Clemons that he would make no charge recommendations and would leave everything up to the grand jury. However, he did recall Mr. Clemons expressing a concern about the state controlling what the grand jury heard and, thereby, controlling the verdict. He further recalled responding to Mr. Clemons' concerns by saying "something to the effect that, present your witnesses and the Grand Jury's going to do what it's going to do."

Although he did not recall doing so, Mr. DeRosier acknowledged that he may have told Mr. Clemons that certain "family issues" had to be considered in the prosecution process. However, at the time of the trial on the motion, he could not recall the specific nature of the family issues other than to say that the family "was very concerned and had contacted [the district attorney's office] . . . about this whole situation."

With regard to the agreement claimed by the defendant, the following exchange occurred between Mr. Clemons and Mr. DeRosier during the hearing on the motion to quash:

> Q    Now, isn't it true, Mr. DeRosier, that you reached an agreement ultimately with me that the case would be fairly presented to the Grand Jury and the Grand Jury would determine the appropriate charge?
>
> A.    Yes.

---

[2] Mr. DeRosier did not question the occurrence of the office telephone conference. He stated that he simply did not remember it taking place.

Q.    Okay.

A.    I don't know if that's an agreement. I made that statement. Mr. DeRosier subsequently suggested that had he considered this conversation to result in anything more than an affirmation of what should take place in any matter before the grand jury, he would have taken additional steps to memorialize the agreement by reducing it to writing. He asserted that he often spoke to defense attorneys at his home about their cases and that this incident was no different from those general conversations.

Mr. Holland could not remember if he participated in the office telephone conversation, but did acknowledge having some conversations with Mr. Clemons concerning the prosecution of the defendant. He recalled that in one conversation Mr. Clemons asked him whether the testimony of the witnesses appearing before the grand jury would be recorded, and he responded that all testimony except that of the lead detective would be recorded. He also recalled Mr. Clemons asking if the defendant could present witnesses to the grand jury, and Mr. Holland responded that "if there was information you wanted the Grand Jury to have, if you told me who the witnesses were, I'd be happy to put them in front of the Grand Jury." He suggested to Mr. Clemons that such action might be a good thing on his part because he was also of the opinion that the grand jury "could go either way" in returning either a manslaughter indictment or a second degree murder indictment.

According to Mr. Holland, he accepted Mr. Clemons' offer to present testimony to the grand jury for no other reason than professional courtesy. He testified that he told Mr. Clemons to provide him a list of the proposed defense

8

witnesses together with a summary of the expected testimony of each witness.[3] When questioned concerning the fact that he had issued a subpoena for the defendant's wife to appear before the grand jury, Mr. Holland denied that she was one of the witnesses offered up by the defendant. Instead, he suggested that he intended to have her appear regardless of any concurrence or opposition of the defendant.

When Mr. Holland was questioned by Mr. Clemons, the following exchange took place addressing Mr. Holland's understanding of the parameters of any agreement with Mr. Clemons concerning the grand jury proceeding:

> Q:     So, it has—it was agreed that this case would be fairly presented to this Grand Jury and they would be allowed to determine the appropriate charge?
>
> A:     Sir, I don't have agreements with defense lawyers on anything like that, because that's what every Grand Jury does, the case is fairly presented and they reach a decision.
>
> Q:     Okay.
>
> A:     So, no, we had no agreement like that. The agreement was, if there was one, that we were going to fairly present the evidence, which was done.

Mr. Sandifer, who was working as an assistant attorney general with the Louisiana Attorney General's office at the time of the hearing on the motion to quash, did recall the office telephone conference and Mr. DeRosier's participation in that conference. He could not recall, however, whether Mr. Holland participated in the conference; nor could he be sure that the conference occurred on October 30, 2013, as the defendant suggested.

When asked by Mr. Clemons if the parties reached an agreement in that conference to carry the matter to the grand jury and allow the grand jury to

_____

[3] Mr. Holland explained that he needed the testimony summary because he was not inclined to place a witness before the grand jury without having some reasonable expectation of what that witness's testimony would address.

9

determine the appropriate charge, Mr. Sandifer responded that carrying the matter to the grand jury would have been required in any event, given the nature of the offense. Mr. Sandifer also acknowledged that Mr. DeRosier agreed to allow the defendant to provide a list of witnesses he wanted to testify before the grand jury. However, Mr. Sandifer explained that Mr. DeRosier did not propose this to the defendant, but rather agreed to the defendant's suggestion in that regard.

Mr. Sandifer acknowledged receiving a summary of the expected testimony of the defendant's proposed witnesses from the defendant's legal team before the presentation to the first grand jury. The summary was structured as numbered factual points rather than as a narrative, and was accompanied by a cover letter from Mr. Clemons dated November 13, 2013, wherein Mr. Clemons stated: "Brett, attached are my notes/talking points. Let me know if you get them or have any questions."[4] None of the four individuals listed were witnesses to the shooting itself, and their proposed testimony provided background material more than anything else. However, this background information, if true, provided a strong picture of the defendant's motivation for shooting Mr. Harris. Mr. Sandifer acknowledged at the trial on the motion that before the four names were submitted, he had no knowledge of their involvement in the circumstances surrounding the offense. The defendant's wife was not one of the proposed witnesses.

When questioned by Mr. Clemons concerning his understanding of the parameters of any agreement between defense counsel and the state, Mr. Sandifer responded as follows:

> Q: And the agreement that was reached was that this Grand Jury would be presented the pertinent evidence and they would be allowed to determine the appropriate charge?

---

[4] The cover letter and the testimony summary were introduced as exhibits in the hearing on the motion to quash.

A:    Right.

Q:    Okay.

A:    We were going to present them with a murder indictment and a manslaughter indictment and they were going to decide on which one—yeah, what's the appropriate charge.

Mr. Clemons recalled that he had two telephone conversations with Mr. DeRosier: the first being the office conference; and the second being the telephone call the next day to the district attorney's home. According to Mr. Clemons, during the office conference Mr. DeRosier, and not the defense team, recommended that the matter be presented to the grand jury for a decision concerning how to charge the defendant; and that Mr. DeRosier offered to allow him to present evidence to the grand jury. In response to his question concerning the recording of witness testimony, Mr. Clemons asserted that Mr. Holland stepped in and stated that all testimony, except that of the lead detective, would be recorded.

When asked why the state simply did not file a manslaughter bill of information if it considered that to be the appropriate charge, Mr. Clemons responded that the issue did not come up in the office conference, but that he broached that very issue with Mr. DeRosier the next evening in the second telephone conversation. According to Mr. Clemons, Mr. DeRosier responded that he had "family issues" and that he had to take it to the grand jury. Mr. Clemons took that to mean that Mr. DeRosier intended to use the grand jury as a cover for the action he intended to take. When questioned by the state, the following exchange transpired concerning Mr. Clemons' understanding of the agreement:

Q:    Okay. And your testimony here today is that there was an agreement for manslaughter—somebody told you that manslaughter was going to be the final charge forever; is that what you're testifying to, sir? I'm trying to get clarity here on what your perceived agreement was.

11

A: Okay. I don't think you heard me say that, Ms. Sigler. I'll say it again. *Our agreement [was] that the case would be fairly presented to the Grand Jury, that this Grand Jury would determine that appropriate charge.* And the record is clear, that Grand Jury determined that manslaughter was the appropriate charge. *So, no, there was no agreement, and I don't think you think there was an agreement that this man—that this Grand Jury would come back with manslaughter.* No, the agreement that the case would be fairly presented with our cooperation, and that we would let this Grand Jury decide. That Grand Jury decided manslaughter, and that agreement was reneged on by somebody who had the power to renege on it.

(Emphasis added.)

Thus, the undisputed facts are that the offense occurred on September 27, 2013, and less than two months thereafter, the defendant's counsel contacted the district attorney by telephone on behalf of his client. Based on the discussions that transpired in the October 30, 2013 telephone conference, Mr. Clemons informed the defendant that the criminal charge would be fairly presented to a grand jury which would determine the appropriate charge based on the evidence before it, either second degree murder or manslaughter. While the defendant takes the position that implicit within the agreement was the understanding that the state would not later seek a new indictment even if new evidence were to become available, he acknowledges that none of the three representatives of the state he communicated with specifically made any such assurance. Additionally, the defendant's counsel sought, and obtained, an agreement with the state that he could present witness testimony before the grand jury. The only condition was that he would provide the state with a summary of the anticipated testimony in advance.

The defendant's counsel followed this office conversation with a personal telephone call to the district attorney after office hours the next day. Mr. Clemons telephoned Mr. DeRosier at his home because his experience as a federal prosecutor caused him to be aware of the influence a prosecutor has in the grand jury, and he wanted assurances that the state would not seek the more severe

12

charge behind the closed doors of the grand jury process. He received that assurance from Mr. DeRosier and appeared satisfied with that assurance.

The grand jury heard the evidence on November 14, 2013, or two weeks after the conversations between defense counsel and the district attorney's office, and over two months after the criminal act. After hearing the evidence, the grand jury indicted the defendant for manslaughter. Approximately seven and one-half months later, on June 26, 2014, a new grand jury heard evidence on the same criminal act and indicted the defendant for the more severe offense of second degree murder. While the state asserts that the presentation to the second grand jury involved evidence not available at the first grand jury proceeding, no evidence presented at the hearing on the motion to quash suggests the content of this new evidence.

In reasons set forth in its ruling on the motion to quash, the trial court accepted, as fact, the assertion that the victim's family was pressuring the state to indict the defendant for second degree murder "even though the circumstances of this case, at least on the surface and based on what was known at the time, indicated that Manslaughter was the more appropriate charge" and that "the desired result from both the defense and prosecutors of the initial grand jury proceeding was a Manslaughter indictment."

The trial court then concluded that when the defendant decided to voluntarily provide testimony from defense witnesses, including the defendant's wife, he "revealed information 'not otherwise available to the state' based on the implicit understanding that both sides would live with the result of the initial grand jury[,]" and regardless of whether or not the information benefited the state, the surrender of this defense information caused the decision of the first grand jury to be binding on the state.

13

In reaching its ruling, the trial court relied primarily on the concurring opinion in *State v. Tanner*, 425 So.2d 760 (La.1983). In that case, the defendant had been involved in an automobile accident in which both the occupants of the other vehicle were killed. The state initially charged the defendant by bill of information with two counts of negligent homicide, but after filing the bill of information, brought the case to a grand jury. After considering all of the evidence presented, that grand jury declined to indict the defendant for any criminal offense. Despite the grand jury's rejection of any charges against the defendant, the state continued to pursue prosecution under the previously filed bill of information.

At the trial on the motion to quash the bill of information, the defendant's counsel testified that an assistant district attorney approached him after the filing of the bill of information and suggested that if the defendant and one of his witnesses would testify before the grand jury, and if the grand jury declined to indict the defendant, the state would dismiss the bill of information. The defendant accepted the offer and he and another witness voluntarily testified before a grand jury.

The assistant district attorney handling the charges for the state testified that "he thought a grand jury would be to the state's advantage because it would eliminate the time and expense of a trial if there were a good defense to the case." *Id.* at 762. While denying that he ever specifically promised that he would dismiss the bill of information, he admitted that the defendant's attorney "could logically have concluded that the charges would be dismissed if the grand jury report was favorable." *Id*.

In granting the motion to quash, the supreme court stated that "[w]hen a district attorney or assistant district attorney makes a good faith bargain with a person accused of a crime and defendant, in reliance on that bargain, relinquishes such a fundamental right as the privilege against self-incrimination, the state

cannot repudiate the bargain." *Id.* at 763. However, the concurring opinion went even further than the majority:

> In my opinion, this case is better decided on principles of judicial integrity, to-wit: our judicial system cannot countenance prosecutorial misconduct which puts an unwary defendant at an unfair disadvantage. We cannot allow the state to enter into a supposed bargain which causes the defendant to reveal information not otherwise available to the state in carrying its burden of proving the defendant's guilt in a criminal prosecution, only to have the state renege on the deal once it discovers chinks in the defendant's tactical armor.

*Id.* at 764. (Blanche, J. concurring).

In *State v. Louis*, 94-761 (La. 11/30/94), 645 So.2d 1144, the supreme court revisited the issue of the enforcement of pretrial agreements. In that case, the defendant's counsel approached the state concerning the defendant providing information about his illegal narcotics suppliers in Texas in exchange for the dismissal of charges against him. After a number of meetings, the defendant provided the state with information, but the state charged him anyway. The supreme court held that "because of defendant's relinquishment of his right against self-incrimination, any constitutional considerations flow in favor of immunity from prosecution." *Id.* at 1151. In reaching this conclusion, the supreme court stated the following concerning the validity of agreements similar to that which is before us:

> In determining the validity of agreements not to prosecute or of plea agreements, the courts generally refer to rules of contract law. *State v. Nall*, 379 So.2d 731 (La.1980); *State v. Lewis*, 539 So.2d 1199 (La.1989). Contractual principles may be helpful by analogy in deciding disputes involving plea agreements. *Ricketts v. Adamson*, 483 U.S. 1, 107 S.Ct. 2680, 97 L.Ed.2d 1 (1987); *Cf. Blackledge v. Allison*, 431 U.S. 63, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977). However, the criminal defendant's constitutional right to fairness may be broader than his or her rights under contract laws. *State v. Nall*, 379 So.2d at 734 (Dennis, J., concurring). Moreover, commercial contract law can do no more than to serve as an analogy or point of departure, since "plea agreements are constitutional contracts." *Ricketts v.*

15

*Adamson*, 483 U.S. at 16, 107 S.Ct. at 2689.  The Court further stated in *Ricketts*:

> The values that underlie commercial contract law and that govern the relations between economic actors, are not coextensive with those that underlie the [D]ue Process Clause, and that govern relations between criminal defendants and the State.  Unlike some commercial contracts, plea agreements must be construed in light of the rights and obligations created by the Constitution.

483 U.S. at 16, 107 S.Ct. at 2689.

In *State v. Nall*, 379 So.2d 731 (La.1980), the prosecutor agreed to reduce a murder charge to manslaughter with a ten-year sentence in exchange for Nall's promise to testify against a companion in accordance with Nall's statement that his companion shot the victim during a residential burglary.  After this agreement was reached, Nall gave an entirely different statement, asserting that he hired the companion to assist in murdering the victim because of Nall's romantic involvement with the victim's wife, and that he fired the first shot.  This court held that when Nall's statement which prompted the agreement turned out to be false, the agreement fell because of failure of cause.  The decision further noted that the agreement did not involve a bargain for immunity which is frequently troublesome because of the bargain's forced infringement on the right against self-incrimination.  Implicit in the court's decision was the consideration that the prosecutor's denial of immunity under the circumstances, irrespective of contract principles, did not violate any concepts of fundamental fairness.

In *State v. Lewis*, 539 So.2d 1199 (La.1989), the defendant entered into a written agreement with the district attorney of Rapides Parish and others in a complex factual situation involving separate state charges in several parishes as well as federal charges.  The defendant's efforts led to the recovery of several tractors stolen from Rapides Parish valued in excess of $125,000, and he admitted participation in and gave information about several other crimes.  However, when he denied responsibility for the arson of his former girlfriend's vehicle, the state concluded he had breached his plea bargain, and several prosecutions went forward.  This court noted that the defendant enjoyed "equitable immunity" as to the prosecution in Rapides Parish.  As to the prosecutions in other parishes, this court held that the contract failed because both parties believed they bargained for something other than what they were actually to get; however, on the basis of constitutional fundamental fairness, this court barred use of the incriminating statements in those prosecutions

16

> because the statements were given under the reasonable belief that they would not be used against him.[5]

*Id.* at 1148 (footnote omitted).

On appellate review, great deference must be given to the findings of fact made by the trial court while ruling on a petitioner's motion to quash. In fact, we will not reverse those findings "unless there is *no* evidence to support [them]." *State v. Wells*, 08-2262, p. 4 (La. 7/6/10), 45 So.3d 577, 580 (emphasis added). Still, the finding of facts we review may only reach properly raised pre-trial issues and not the defenses on the merits of the pending charge. *State v. Byrd*, 96-2302 (La. 3/13/98), 708 So.2d 401. Our deference stems from the constitutional limitation on our appellate jurisdiction: "In criminal cases [an appellate court's] jurisdiction extends only to questions of law." La. Const. art. 5, § 10(B). This limited scope of review also aligns with the "complementary role of trial courts and appellate courts." *State v. Love*, 00-3347, p. 9 (La. 5/23/03), 847 So.2d 1198, 1206. This is because the judges presiding in the trial court have the unique "opportunity to observe the witnesses and weigh the credibility of their testimony." *Wells*, 45 So.3d at 581. Still, "[a] trial court necessarily abuses its discretion if its ruling is based on an erroneous view or application of the law." *Franklin*, 147 So.3d at 240. In that situation, we need not give such heightened deference to the trial court's ruling. *Id.*

With regard to the trial court's factual findings, we note that while the record does contain some vague discussion concerning pressure from the victim's family, the evidentiary record does not support a factual finding that an indictment for manslaughter was considered by all to be the appropriate disposition in October and November of 2013. Neither Mr. DeRosier nor Mr. Clemons expressed an

---

[5] The supreme court followed its discussion of *Lewis* with a discussion of *Tanner*, but since *Tanner* has previously been discussed, we have not reproduced that discussion.

opinion on the appropriate charge; Mr. Holland was of the opinion that the grand jury could easily go either way; and Mr. Sandifer was of the opinion that the criminal act was clearly one of second degree murder. Additionally, with regard to the trial court's reliance on the defendant allowing his wife to testify, the record establishes that she was not one of the witnesses offered to the state, and Mr. Holland made it clear that he intended to call her as a witness before the grand jury, regardless of any agreement with the defense team.

The only sentence provided for one convicted of second degree murder is "life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence." La.R.S. 14:30.1(B). Additionally, La.Code Crim.P. art. 437 provides, in pertinent part, that "[t]he grand jury shall inquire into all capital offenses and offenses punishable by life imprisonment[.]" As pointed out by the witnesses for the state, given the potential charge of second degree murder, the matter had to be presented to a grand jury. Additionally, the prosecutor's moral, ethical, and legal responsibility is to present a case fairly to the grand jury. Thus, that part of the agreement the defendant obtained from the state was nothing more than what would otherwise be required.

We also find that the trial court erred as a matter of law in relying on the concurring language set out in *Tanner*, 425 So.2d 760. The jurisprudence is consistent in finding the existence of a binding agreement between the state and a defendant only when the defendant relinquishes a constitutional right as part of an agreement. The majority of the supreme court in *Tanner* choose not to expand the existing rule despite the concurring opinion. We follow the supreme court's jurisprudence.

In the case now before us, the defendant did provide the state with evidence which he considered favorable to him, but he did not relinquish his right against

18

self-incrimination by testifying; nor did he relinquish any other fundamental constitutional right. Additionally, the "[s]pousal privilege is not constitutional in nature." *State v. Hughes*, 587 So.2d 31, 40 (La.App. 2 Cir. 1991), *writ denied*, 590 So.2d 1197 (La.1992).

## DISPOSTION

For the foregoing reasons, we deny the motion of the State of Louisiana to supplement the appellate record, reverse the trial court's grant of the motion to quash dismissing the second degree murder indictment against the defendant, Woodrow Karey, Jr., also known as Woodrow Karey, II. We remand the matter to the trial court for further proceedings.

**MOTION TO SUPPLEMENT DENIED; REVERSED AND REMANDED.**

STATE OF LOUISIANA

VERSUS

WOODROW KAREY, JR. A/K/A WOODROW KAREY, II


**COOKS, J., dissenting.**

I respectfully dissent from the portion of the majority opinion reversing the grant of Defendant's motion to quash. The facts established on November 14, 2013, Defendants was indicted for Manslaughter. On that same date the grand jury returned a "no true bill" on the charge of Second Degree Murder. Despite that, seven months later, Defendant was indicted by another grand jury on the charge of Second Degree Murder for the same crime. Defendant then filed his Motion to Quash the second indictment alleging it violates the understanding between he and the State that all would be bound by the result of the initial grand jury. The trial court agreed with Defendant, and granted the Motion to Quash.

The trial court heard testimony from the prosecutors and defense counsel regarding the many conversations in October and November of 2013 leading up the initial grand jury proceeding. The trial court specifically found there "was a joint effort to steer the grand jury towards a Manslaughter indictment." My review of the record find ample support for this conclusion. The district attorney acknowledged it may have "suggested" that if Defendant testified and a no true bill was issued, the bill of information would be dismissed. There was also clear testimony from an assistant district attorney that defense counsel "could logically have concluded" that the charged would be dismissed once the grand jury returned a no true bill on the charge of Second Degree Murder. The trial court relied on

these "admissions' by the State to find a deal binding the State to the grand jury's result. I find no basis for the majority to reverse that decision.

The record established, in exchange for this push to get an indictment for Manslaughter, Defendant provided specific information regarding what witnesses would say, provided a specific list of witnesses and allowed his wife to testify without invoking her right to spousal privilege. By providing the list of witnesses and the key points of each witnesses' testimony, the defense gave the prosecution an advantage they would not otherwise have had when the matter was later brought back to a second grand jury. This information was only given based on the implicit understanding that both sides would be bound by the initial grand jury's determinations. The State violated that agreement, and the trial court did not abuse its discretion in granting the motion to quash.