# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                    NEWS RELEASE #036

FROM: CLERK OF SUPREME COURT OF LOUISIANA


The Opinions handed down on the **29th day of June, 2017**, are as follows:


**BY HUGHES, J.**:

2016-K-0377        STATE OF LOUISIANA v. WOODROW KAREY, JR., A/K/A WOODROW KAREY, II
                   (Parish of Calcasieu)

                   For the reasons stated, the judgment of the appellate court is
                   reversed, and the district court judgment, granting the
                   defendant's motion to quash and dismissing the second degree
                   murder indictment, is reinstated.  Further, the stay order issued
                   by this court on August 31, 2016 is hereby lifted.
                   APPELLATE COURT JUDGMENT REVERSED; DISTRICT COURT JUDGMENT
                   REINSTATED; STAY LIFTED.

                   GUIDRY, J., dissents for the reasons assigned by Justice Clark.
                   CLARK, J., dissents and assigns reasons.
                   CRICHTON, J., dissents and assigns reasons.
                   GENOVESE, J., concurs in the result.

06/29/2017

SUPREME COURT OF LOUISIANA

NO. 2016-K-0377

STATE OF LOUISIANA

VERSUS

WOODROW KAREY, JR. A/K/A WOODROW KAREY, II

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
THIRD CIRCUIT, PARISH OF CALCASIEU

**HUGHES, J.**

This case involves an alleged "agreement not to prosecute," under which the defense claimed that in exchange for the defense providing the names of witnesses who would testify before the grand jury, the sharing of defense attorney work product, and the waiving of the spousal privilege as to the grand jury testimony of the defendant's wife, the prosecution agreed to abide by the grand jury indictment, whether manslaughter or second degree murder. When the grand jury returned a manslaughter indictment, the State nevertheless presented the case to the grand jury again, approximately seven-and-one-half months after the first indictment, and procured an indictment for second degree murder. The defendant filed a motion to quash, alleging the prosecution failed to abide by the agreement. The district court granted the motion, quashing the second degree murder indictment. On appeal, the appellate court reversed. For the reasons that follow, we reverse the appellate court and reinstate the district court ruling.

## FACTS AND PROCEDURAL HISTORY

On September 27, 2013 Ronald Harris, Sr., pastor of Tabernacle of Praise Church in Lake Charles, Louisiana, was shot and killed during a church service by the defendant, Woodrow Karey, Jr. Mr. Karey thereafter surrendered to police, stating, "He raped my wife."

Several conferences were held between defense counsel and the prosecution, which resulted in defense counsel providing the prosecution with a list of four witnesses, along with a written summary of the substance of the testimony that would be provided by these witnesses, and it was agreed these witnesses would testify before the grand jury. The defendant also agreed to waive the spousal privilege as to his wife's testimony before the grand jury. Further, the parties agreed that the matter would be "fairly" presented to the grand jury, and the grand jury would decide the appropriate charge (manslaughter or second degree murder). The defense alleged the parties also agreed that they would abide by the decision of the grand jury, and the defendant understood this meant the matter would not subsequently be brought back to a grand jury. The defendant's wife and the witnesses named by the defense testified before the grand jury, which indorsed the manslaughter indictment "a true bill" and the second degree murder indictment "not a true bill." Prosecution was instituted against the defendant for manslaughter, a violation of La. R.S. 14:31, with the filing of the indictment on November 14, 2013.

Sometime after the first grand jury indictment, a different lead prosecutor was placed in charge of the case. Thereafter, the State returned to the grand jury to present "more evidence" on the instant offense, and on June 26, 2014 the grand jury indicted the defendant with second degree murder, a violation of La. R.S. 14:30.1. The State then dismissed the manslaughter prosecution and went forward with the second degree murder prosecution.

2

On August 8, 2014 the defendant filed a motion to quash the second degree murder indictment, contending: (1) the State breached the agreement to present the case to the first grand jury and to abide by the grand jury decision, in exchange for defense counsel's assistance and cooperation; and (2) although La. C.Cr.P. art. 386[1] authorizes a subsequent indictment or information for the same offense following a grand jury's failure to indict, Article 386 does not authorize subsequent indictment or information for the same offense when the grand jury *does* indict the defendant for a lesser charge on the same offense.[2]

Following a January 6, 2015 hearing on the defendant's motion to quash, the district court found that the result desired by both the defense and prosecution from the initial grand jury proceeding was a manslaughter indictment, that there was an "implicit understanding" between the defense and the prosecution "that both sides would live with the result of the initial grand jury - either Manslaughter or Second Degree Murder," and for these reasons the defense revealed information "not otherwise available to the [S]tate." The district court concluded that the State was bound to "what was at the time its desired result" and granted the motion to quash the second degree murder indictment.

On appeal by the State, the appellate court reversed the grant of the motion to quash and remanded the matter to the district court for further proceedings. **State v. Karey**, 15-0522 (La. App. 3 Cir. 11/12/15), 180 So.3d 500. This court granted the defendant's subsequent writ application. **State v. Karey**, 16-0377 (La. 10/28/16), 213 So.3d 389.

---

[1] Article 386 provides, in pertinent part: "The failure or refusal of a grand jury to indict a defendant does not preclude a subsequent indictment by the same or another grand jury, or the subsequent filing of an information or affidavit against him, for the same offense."

[2] The defendant has not presented his argument, based on La. C.Cr.P. art. 386, to this court, and we do not discuss it herein.

Motion to Quash

The concept of fundamental fairness is inherent in the Due Process Clause of the U.S. Fourteenth Amendment and in La. Const. Art. I, § 2, which do not dictate a particular procedure, only a fundamentally fair result. See **In re C.B.**, 97-2783, pp. 10-11 (La. 3/4/98), 708 So.2d 391, 397. The plea bargaining[3] process presupposes fairness in agreements between an accused and a prosecutor. **Santobello v. New York**, 404 U.S. 257, 261, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971). When a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled. **Id.**, 404 U.S. at 262, 92 S.Ct. at 499.

As a general matter, in determining the validity of agreements not to prosecute or of plea agreements, the courts generally refer to analogous rules of contract law, although a defendant's constitutional right to fairness may be broader than his or her rights under the law of contract. **State in Interest of E.C.**, 13-2483, p. 4 (La. 6/13/14), 141 So.3d 785, 787 (per curiam); **State v. Cardon**, 06-2305, p. 1 (La. 1/12/07), 946 So.2d 171, 171-72 (per curiam); **State v. Givens**, 99-3518, p. 14 (La. 1/17/01), 776 So.2d 443, 455; **State v. Louis**, 94-0761 (La. 11/30/94), 645 So.2d 1144, 1148-49; **State v. Lewis**, 539 So.2d 1199, 1204-05 (La. 1989); **State v. Nall**, 379 So.2d 731, 734 (La. 1980). See also **United States v. Ringling**, 988 F.2d 504, 506 (4th Cir. 1993) ("Plea bargains rest on contractual principles, and each party should receive the benefit of its bargain. Yet, the analysis of the plea agreement must be conducted at a more stringent level than in a commercial

---

[3] The principles announced in jurisprudence concerned with plea bargains are applicable to other bargains between defendants and prosecutors. See **State v. Tanner**, 425 So.2d 760, 763 (La. 1983). See also, e.g., **State v. Louis**, 94-0761 (La. 11/30/94), 645 So.2d 1144; **State v. Franklin**, 13-1489 (La. App. 4 Cir. 6/11/14), 147 So.3d 231, 235, writ denied, 14-1326 (La. 2/13/15), 159 So.3d 460; **State v. Meredith**, 35,026 (La. App. 2 Cir. 9/26/01), 796 So.2d 109.

contract because the rights involved are generally fundamental and constitutionally based.").

When a district attorney or assistant district attorney makes a good faith bargain with a person accused of a crime and the defendant, in reliance on that bargain, relinquishes a fundamental right, the State cannot repudiate the bargain. **State v. Tanner**, 425 So.2d 760, 763 (La. 1983); **State v. Hingle**, 242 La. 844, 859, 139 So.2d 205, 210 (1962) (on rehearing). "[C]ourts should give effect to such agreement[s], for it would not be consonant with the pledge of the [S]tate's public faith, reposed in these officers by the legislative branch of our government, to permit them to repudiate bargains made with persons accused of crimes who are acting in good faith, and, in reliance thereon, comply with their commitments by relinquishing valuable and fundamental rights." **State v. Hingle**, 242 La. at 865, 139 So.2d at 212. Nevertheless, "[a]bsent any showing of detrimental reliance prejudicial to the substantial rights of the accused, **or** evidence of devious practice by the government such as bad-faith negotiation designed to psychologically probe the defense **or gain some other improper advantage**, the government remains free to withdraw from a plea agreement up to the time the plea is entered." **State v. Caminita**, 411 So.2d 13, 16 (La. 1982), cert denied, 459 U.S. 976, 103 S.Ct. 314, 74 L.Ed.2d 291 (1982) (emphasis added).

In the instant case, the district court's January 6, 2015 ruling stated as follows, in pertinent part:

> The Court accepts the testimony that the District Attorney had some "family problems," meaning that the decedent's family was pushing for an indictment of Second Degree Murder rather than Manslaughter even though the circumstances of this case, at least on the surface and based on what was known at the time, indicated that Manslaughter was the more appropriate charge. The Court accepts the representation that the desired result from both the defense and prosecutors of the initial grand jury proceeding was a Manslaughter indictment. While such an initial indictment is not necessarily binding on the District Attorney's office to prevent a future indictment on a more serious charge, the question becomes whether or not the

Defendant voluntarily provided information or gave up rights that he would otherwise have withheld to achieve what was at the time a joint goal.

The initial indictment arguably was a benefit to the District Attorney's office to help with the "family problems" and to further resolution of a high profile case in which the accused was perhaps seen in a higher regard by the community than the victim. Furthermore, by providing a list of witnesses and the key points of each witness'[s] testimony, the defense arguably "showed its hand" to the District Attorney's office, and arguably gave the District Attorney's office an advantage they otherwise would not have had when the matter was later brought back to a grand jury.

\* \* \*

In this case, the defendant revealed information "not otherwise available to the [S]tate" based on the implicit understanding that both sides would live with the result of the initial grand jury - either Manslaughter or Second Degree Murder. Whether or not such information actually benefitted the [S]tate later in obtaining the later indictment is not the point. The point is that more information was made available by the defendant than he was obligated to provide. This perceived benefit binds the [S]tate to what was at the time its desired result.

The district court found as a matter of fact that the defense and the prosecution had a common goal to obtain a manslaughter indictment from the initial grand jury and that there was an "understanding" or agreement between the parties that they would "live with" or be bound by the conclusion of that grand jury. The district court further found that the disclosure of the defense attorney's work product to the prosecution not only aided the prosecution in achieving the common goal of a manslaughter indictment, but gave the prosecution an advantage by revealing defense strategy.

Because the complementary role of trial courts and appellate courts demands that deference be given to a trial court's discretionary decision, an appellate court is allowed to reverse a trial court on a motion to quash only if that finding represents an abuse of the trial court's discretion. **State v. Love**, 00-3347, pp. 9-10 (La. 5/23/03), 847 So.2d 1198, 1206. In applying the abuse-of-discretion standard of review, the analysis may be further broken down into the component parts of the

6

trial court decision. **State v. Thompson**, 11-0915, p. 13 (La. 5/8/12), 93 So.3d 553, 563. When a trial court makes findings of fact based on the weight of the testimony and the credibility of the witnesses, a reviewing court owes those findings great deference, and may not overturn those findings unless there is no evidence to support those findings. **Id.**, 11-0915 at pp. 13-14, 93 So.3d at 563; **State v. Wells**, 08-2262, p. 4 (La. 7/6/10), 45 So.3d 577, 580; **State v. Hunt**, 09-1589, p. 6 (La. 12/1/09), 25 So.3d 746, 751. See also La. Const. Art. V, § 5(C) ("In criminal matters, [the supreme court's] appellate jurisdiction extends only to questions of law."); La. Const. Art. V, § 10(B) ("In criminal cases [a court of appeal's] appellate jurisdiction extends only to questions of law."). Legal findings or conclusions of the trial court are reviewed de novo. **Id.**, 11-0915 at p. 14, 93 So.3d at 563; **State v. Hamdan**, 12-1986, p. 6 (La. 3/19/13), 112 So.3d 812, 816; **State v. Smith**, 99-0606, p. 3 (La. 7/6/00), 766 So.2d 501, 504. Thus, a trial court's ruling on a motion to quash can be found to be an abuse of discretion if the trial court's factual findings are not supported by evidence in the record or if the court's legal findings or conclusion are erroneous.

In this case, the evidence submitted during the January 6, 2015 hearing on the defendant's motion to quash provides a reasonable basis for the district court's factual findings, as revealed through the testimony of the four witnesses: then-District Attorney John DeRosier, Assistant District Attorney Hugo Holland, former Assistant District Attorney Brett Sandifer, and Defense Attorney Todd Clemons.

Then-District Attorney John DeRosier testified that because of the nature of this case, the prosecution was required to take it to a grand jury. Mr. DeRosier stated that, in a conversation with defense counsel Todd Clemons, Mr. Clemons (who is a former prosecutor) expressed concern that a prosecutor can "sway a Grand Jury one way or the other," and Mr. Clemons requested that he be allowed to present defense witnesses to the grand jury. Mr. DeRosier said that he told Mr.

Clemons he could "present [his] witnesses and the Grand Jury's going to do what it's going to do." When asked by Mr. Clemons, on direct examination,[4] whether he (Mr. DeRosier) had told him (Mr. Clemons) "that your [Mr. DeRosier's] goal was to lay it all out in front of the Grand Jury and let the Grand Jury make the call," Mr. DeRosier responded, "I don't remember those words, but that sounds like something I would say." When asked by Mr. Clemons whether "you [Mr. DeRosier] reached an agreement ultimately with me [Mr. Clemons] that the case would be fairly presented to the Grand Jury and the Grand Jury would determine the appropriate charge," Mr. DeRosier replied, "Yes . . . I don't know if that's an agreement. I made that statement." Mr. DeRosier indicated that he did not personally present the case to the first grand jury, rather, Hugo Holland and Brett Sandifer were the prosecutors on the case at that time. Mr. DeRosier also testified that most agreements entered into with defendants are "verbal agreements," and although written agreements are sometimes used, "[i]t's fairly rare." Mr. DeRosier further testified that neither he, nor anyone in his presence, ever promised the defense that, if a manslaughter indictment were returned, the prosecution would not return to the grand jury to present further evidence.

Assistant District Attorney Hugo Holland testified that there was no "agreement" between the parties. He stated, "What I offered to you [Mr. Clemons] was that if there was information you wanted the Grand Jury to have, if you told me who the witnesses were, I'd be happy to put them in front of the Grand Jury." Mr. Holland further testified that he told Mr. Clemons, "I think that the Grand Jury could go either way, and it was probably a good idea for the Defense to provide me a list of witnesses that perhaps could push them towards a . . . manslaughter

---

[4] During the January 6, 2015 hearing, defense counsel Todd Clemons conducted the direct and re-direct examination of all witnesses, except when he testified himself and then defense co-counsel Adam Johnson conducted the direct and re-direct examinations. Assistant District Attorney Carla Sigler examined witnesses called by the defense, on behalf of the State, which called no witnesses.

charge." Mr. Holland clarified, "I don't have to, as a prosecutor, allow you [Mr. Clemons] or any other defense lawyer to present any evidence. I gave you the courtesy of doing that, and you gave me a list of names of people that you wanted to testify in front of the Grand Jury . . . . I agreed to let you give me the list and that I would present the witnesses."

With respect to testimony given by the defendant's wife, Janet Karey, before the grand jury, Mr. Holland testified, "I sent her a subpoena, and so it wasn't up to you [Mr. Clemons] to determine whether she testified or not . . . . That was not part of any agreement. I just told you she got a subpoena and she was testifying." When asked about a spousal privilege, Mr. Holland stated, "If she wanted to claim it [the spousal privilege] when she came in, that would be up to her. It's my legal opinion, that probably doesn't apply at Grand Jury, but had she chose to do so, then things might be different." Mr. Holland stated that Ms. Karey did not claim a spousal privilege when called to testify before the grand jury.

Mr. Holland further denied that he, or anyone in his presence, told the defense that the prosecution would refrain from ever presenting the grand jury with any additional evidence if a manslaughter indictment were to be returned. Mr. Holland further testified that he "received no concessions" from the defense and, to his knowledge, the defense did nothing that would ultimately be detrimental to the defendant's case. When asked if the defense detrimentally relied on anything that had occurred in the case, Mr. Holland responded, "I can't imagine how it would possibly be." Mr. Holland denied reaching any type of agreement with the defense, and he stated, "I don't have to reach an agreement with the Defense for anything related to Grand Jury actions." With respect to statements that the case would be "fairly presented" to the grand jury, Mr. Holland stated, "[T]hat's what every Grand Jury does, the case is fairly presented and they reach a decision."

9

However, Mr. Holland further stated, "The agreement was, if there was one, that we were going to fairly present the evidence, which was done."

Former Assistant District Attorney Brett Sandifer testified that, although he previously worked for the Calcasieu Parish District Attorney's office, at the time of the hearing he was working as an Assistant Attorney General. Mr. Sandifer recalled that, after the defendant was arrested, but before he was charged, there was a telephone conference between the prosecution (Mr. DeRosier, himself, and possibly Mr. Holland) and the defense (Mr. Clemons and Mr. Johnson), during which Mr. DeRosier stated that the case was going to be presented to the grand jury for determination of the charge because "that's what we have to do on a case such as that . . . . [A]nytime you go to Grand Jury, that's what . . . happens." Mr. Sandifer also indicated that Mr. DeRosier told Mr. Clemons that he would subpoena witnesses for the defense, if the defense provided a list of the witnesses.

When asked whether he recalled Mr. Clemons stating that the defense would discuss it and let the prosecution know "whether we would be participating in the Grand Jury," Mr. Sandifer stated that he remembered something like that. Mr. Sandifer acknowledged that a few days later he and Mr. Holland met with Mr. Clemons and Mr. Johnson in a conference room at the District Attorney's office to discuss the witnesses that the defense wanted to testify before the grand jury, the relationship of those witnesses to the defendant, and the nature of their testimony. Mr. Sandifer indicated that it was agreed that the witnesses would present testimony before the grand jury, and the grand jury would determine the appropriate charge.

In conjunction with Mr. Sandifer's testimony, Exhibit "D," in globo, was introduced, which included an email from Mr. Clemons to Mr. Sandifer regarding the defense witnesses, including a list of witness names and a summary of the proposed substance of each witness's testimony. Mr. Sandifer explained that,

since some of the defense-requested witnesses were not mentioned in the incident report, either he or Mr. Holland had asked the defense for a summary of what these witnesses would likely say before the grand jury, and the emailed list contained a summary of what Mr. Clemons felt was relevant about each of the witnesses' testimony before the grand jury. Mr. Sandifer denied that the prosecution had agreed not to go back to the grand jury after the first indictment, maintaining they only agreed to present the witnesses requested by the defense to the grand jury. Mr. Sandifer emphasized that, in every case before the grand jury, it is the prosecutor's job to fairly present the evidence to the grand jury, and the grand jury then decides the appropriate charge.

Mr. Sandifer also testified that two bills were submitted to the grand jury, one for manslaughter and one for second degree murder; the grand jury returned a "true bill" as to manslaughter and a "no true bill" as to second degree murder. Mr. Sandifer further testified that the investigation was ongoing at the time the matter was before the first grand jury, noting that there was a "phone issue we still had to resolve" and there were witnesses that law enforcement had not interviewed. Mr. Sandifer indicated that even though there was no statute of limitations on the prosecution of murder, since the defendant was arrested in September 2013 for murder, there was a limited time period during which charges could be timely filed against the defendant, otherwise the defendant would have to be released from custody.[5]

---

[5] Article 701(B) of the Code of Criminal Procedure provides, in pertinent part:

> The time period for filing a bill of information or indictment after arrest shall be as follows:
> (1)(a) When the defendant is continued in custody subsequent to an arrest, an indictment or information shall be filed within forty-five days of the arrest if the defendant is being held for a misdemeanor and within sixty days of the arrest if the defendant is being held for a felony.
> (b) When the defendant is continued in custody subsequent to an arrest, an indictment shall be filed within one hundred twenty days of the arrest if the defendant is being held for a felony for which the punishment may be death or life imprisonment.

Defense Attorney Todd Clemons, on examination by co-counsel, Adam Johnson, testified that he contacted Mr. DeRosier in October of 2013 to arrange a meeting to discuss the case, and a phone conference was set up for October 30, 2013. Mr. Clemons testified that, during the phone conference, Mr. DeRosier told him that the prosecution would "present the case to the Grand Jury and . . . let the Grand Jury determine the appropriate charge." Mr. Clemons also testified that Mr. DeRosier told him that he could "present whatever witnesses you deem appropriate." Mr. Clemons stated that, in connection with their agreement, the defense was giving up "certain rights," including attorney work product.[6] Mr. Clemons further testified that he "felt like [the District Attorney] wanted the cover of the Grand Jury to be able to give the [victim's] family the perception that this was the Grand Jury's decision and [the District Attorney] had no involvement with that," and for that reason the prosecution did not file a bill of information for manslaughter and instead took the case to the grand jury. Mr. Clemons also stated that he "got the impression [the District Attorney] needed us to cooperate . . . [b]ecause [the District Attorney] needed to have the cover, that this was why it went down that way."

---

(2) When the defendant is not continued in custody subsequent to arrest, an indictment or information shall be filed within ninety days of the arrest if the defendant is booked with a misdemeanor and one hundred fifty days of the arrest if the defendant is booked with a felony.

[6] Mr. Clemons' November 13, 2013 email stated in pertinent part: "Brett, attached are my notes/talking points . . . ." Two typed pages were attached to the email, with the heading "Notes" and the date "November 11, 2013," followed by a list of four witnesses (Walter Bartie, Greg Lanette, Deputy Rusty Sittig, and Deputy Nathan McKee). Under each witness's name was a numbered list of facts each witness would presumably testify to (ranging from seven items (Dep. McKee) to twenty-six items (Mr. Bartie)). Mr. Bartie was listed as a member of the church pastored by the victim and of which he (Mr. Bartie) and the defendant were members of the Board of Directors. Mr. Bartie was expected to testify that he was with the defendant every day for the four days preceding the murder, and he would testify that the defendant believed that the victim raped his wife. Mr. Lanette was a co-worker of the defendant, who was expected to testify about the defendant's good character. Deputy Sittig was the officer who took a report from the defendant and his wife, Janet Karey, alleging that she was raped by the victim. Deputy McKee was dispatched to the crime scene on the day of the murder, and he was expected to testify that he encountered the defendant after the murder, and the defendant stated that the victim raped his wife.

With respect to Mr. Holland, Mr. Clemons testified:

> November 7[th], I had a conversation with Mr. Holland. Again, I wanted to clarify the agreement. I wanted to -- because I knew Mr. Holland was presenting the case, he was the lead prosecutor. I had no dealings with Mr. Holland. I think I'm a good judge of character, so I wanted to talk to him. And I had a good feeling about what Mr. Holland did, and I still have a good feeling about how Mr. Holland handled this case. I have strong feelings about how other people handled it afterwards. But Mr. Holland gave me his word the case would be fairly presented to the Grand Jury, the Grand Jury would decide. He said, "Todd, I think you're making the right decision." He said, "Without your witnesses, there will be no way to get manslaughter, but with your witnesses, I think manslaughter is very likely. So I think you're making a good decision by cooperating and allowing your witnesses to testify."

> * * *

> . . . He said, "Todd, I know you don't know me from Adam; I don't know you. If you have any concerns about my word, my credibility, talk to Glen Vamvoris or Jim Boren."[7]

Mr. Clemons implied that such assurances from the prosecutor would not have been necessary unless the parties *were* negotiating an agreement, which would require the trust of the defense attorneys (who could not legally be present during the grand jury proceedings) that the prosecution would elicit from the defense witnesses the testimony desired by the defense before the grand jury.

Mr. Clemons further testified, "[T]here were no conditions placed on the agreement . . . other than [the defense] presenting them with the witnesses, and the Grand Jury determining the appropriate charge. Nothing [sic] discussed what would happen after the Grand Jury determined the appropriate charge." When asked whether the prosecution ever specifically said they would never go back to the grand jury, Mr. Clemons said, "Absolutely not, because that was not contemplated." Mr. Clemons maintained that there was an agreement to let the

---

[7] Mr. Holland was asked during the hearing if he made this statement, referring Mr. Clemons to Mr. Vamvoris and Mr. Boren, and Mr. Holland admitted that he did, but he could not remember why, other than recalling Mr. Clemons stating, "I don't know you."

first grand jury decide the appropriate charge, and they would all abide by that decision.

With respect to the testimony of the defendant's wife, Janet Karey, Mr. Clemons testified that Mr. Holland was adamant that she testify, quoting Mr. Holland as having said, "In order for this deal to happen, she has to testify . . . . [T]he Grand Jury must hear from her." Mr. Clemons indicated to Mr. Holland at that time that Ms. Karey was not one of their witnesses, and they did not feel she had anything beneficial to add to the case, noting that the spousal privilege had to be waived for her testimony. Mr. Clemons also stated, "We felt like her testifying would be the next-door neighbor of our client testifying . . . . [W]e felt like we certainly were giving up something by having her testify . . . [b]ecause she could possibly testify about previous conversations she had had with her husband about what happened. Once she got in that Grand Jury . . . we [had] no idea of what she would tell them." Mr. Clemons further indicated that a second grand jury was not mentioned to the defense until Assistant District Attorney Cynthia Killingsworth sent the defense an email on June 25, 2014, approximately seven-and-one-half months after the first indictment, saying that she was bringing the case back to the grand jury.[8]

---

[8] Relative to Ms. Killingsworth, the parties entered into a written stipulation at the beginning of the January 6, 2014 hearing, which was introduced as evidence and stated:

> The State does hereby stipulate that when Cynthia Killingsworth brought the case back to the grand jury for a second time, she did so under the mistaken belief that she was bringing the case back to the same grand jury that had initially heard the case. As such, Mrs. Killingsworth's email on June 25th wherein she represented that she was going to present more evidence in this case to the grand jury the following day on June 26th, 2014 and that it was the same grand jury who indicted your client previously was done in error. The grand jury was the special grand jury, which heard the first presentation, although the members of the special grand jury were not the same. [Underscoring original.]

Attached to the stipulation were documents, confirming that the membership of the first grand jury differed from the membership of the second grand jury, along with the June 25, 2014 Killingsworth email, which stated:

> I wanted to let you know that I am going to present more evidence in this case to the grand jury tomorrow. It is their last meeting and it is the same grand jury

14

Mr. Clemons further testified, "Under no circumstances would I give it [his attorney work product] to a prosecutor, but for hav[ing] an agreement with the prosecutor that could benefit my client. In this case we had an agreement with the prosecutor that if we gave them a summary of the witnesses who would testify, they would be honorable men and let this Grand Jury decide the appropriate [charge]." Mr. Clemons stated that his work product was the result of interviews with several defense witnesses, and the email he sent to the prosecutors contained a summary of "detailed extensive [d]efense work product." Mr. Clemons testified that he was required to give his work product to the prosecution as part of their agreement, stating that Mr. Holland told him he was not going to call the defense witnesses and let them just say what they wanted to say, so the defense would have to give him "some guidance as to what pertinent information they have." Mr. Clemons said, "[I]t was required in order to consummate this deal."

Mr. Clemons further related that he did not think reducing the agreement to writing was necessary because he thought he was dealing with honorable men. He stated, "Mr. Hugo Holland turned out to be an honorable man because he kept his word . . . . I think Mr. DeRosier is an honorable man, but for some reason he reneged on his word." Mr. Clemons confirmed that at some point Ms. Killingsworth took over as lead prosecutor (from Hugo Holland and Brett Sandifer), and she returned to the grand jury the second time and obtained the second degree murder indictment.

Mr. Clemons also testified that Mr. Holland's behavior immediately after presenting the case to the first grand jury was a confirmation of the existence of an agreement between them. During the grand jury presentation, Mr. Clemons and Mr. Johnson waited in the reception area of District Attorney's office, where Mr.

who indicted your client previously. Once the grand jury reports, I will let you know if this changes anything. I am copying [the district court judge] so that he will be aware as well. . . .

15

Holland met them after the grand jury presentation concluded. Mr. Clemons indicated that, even though Mr. Holland could not yet divulge the decision reached by the grand jury, because it had not been filed with the court, Mr. Holland shook his (Mr. Clemons') hand and said, "You made the right decision, everything went well . . . . [I]t was successful." Mr. Clemons further stated:

> [Mr. Holland] said something to [the] effect that if it was second degree, you will need to get more money, and if it's manslaughter, you won't, and made some comment that, "You don't need any more money."

> * * *

> But we clearly knew, by him shaking my hand and saying it went well and don't worry about getting any more money, we were very confident . . . that the Grand Jury had returned a manslaughter indictment, which was our mutual goal, "us" being me, you, and Mr. Holland and Mr. DeRosier

Mr. Clemons related that he considered Mr. Holland's actions and statements at that time a "consummation" of their agreement and indicated Mr. Holland's intention to abide by the grand jury's manslaughter indictment.

In this case, the district court was presented with conflicting testimony. Defense Attorney Todd Clemons testified that, in exchange for sharing defense attorney work product (which identified witnesses to support the defense position that manslaughter was a more appropriate charge than second degree murder), along with engaging in cooperative discussions with the prosecution concerning presentation of the identified witness testimony to the grand jury, and in waiving the spousal privilege as to the defendant's wife's testimony before the grand jury, the prosecution agreed to submit the defense witnesses to the first grand jury and abide by that grand jury's decision as to the appropriate charge and proceed only on the charge that grand jury handed down. Contrarily, the State prosecutors testified that they had no agreement with the defense, but if they did, it was only to fairly present the evidence to the grand jury and allow the grand jury to decide the appropriate charge, as that is what the law requires. In ruling in the defendant's

16

favor, granting the motion to quash and dismissing the second degree murder prosecution, the district court made the decision to credit the testimony of the defense over that of the prosecution and, in essence, granted specific performance of the agreement by ensuring that the prosecution of the defendant could proceed only on a manslaughter charge.

As stated hereinabove, when a trial court in a criminal case makes findings of fact based on the weight of the testimony and the credibility of the witnesses, a reviewing court may not overturn those findings unless there is no evidence to support those findings. **State v. Thompson**, 11-0915 at pp. 13-14, 93 So.3d at 563; **State v. Wells**, 08-2262 at p. 4, 45 So.3d at 580; **State v. Hunt**, 09-1589 at p. 6, 25 So.3d at 751. In this case, there was evidence in the record upon which the district court could have ruled either that there existed an agreement between the parties or that there was no agreement between the parties. The district court's decision to credit the defense testimony over that of the prosecution cannot be overturned. See **Id.** See also **State v. Meredith**, 35,026, p. 5 (La. App. 2 Cir. 9/26/01), 796 So.2d 109, 113 (holding that because the court credited defense testimony over prosecution testimony and there was a reasonable basis in the record for the trial court finding that an agreement existed between the defense and the prosecution, the decision could not be disturbed on appeal).[9]

---

[9] In **State v. Meredith**, it was asserted that when the matter was first presented to the grand jury, an agreement had been reached between the defense and the district attorney, whereby there would be no further prosecution if the grand jury returned a no true bill, provided the defendant waived his privilege against self-incrimination and testified before the grand jury. See **State v. Meredith**, 35,026 at p. 1, 796 So.2d at 111. After the grand jury returned a no true bill, no further prosecutorial action was taken against the defendant, until a new district attorney took office; whereupon, an arrest warrant was issued for the defendant and the matter was presented to a second grand jury, which returned a vehicular homicide indictment. **Id.**, 35,026 at pp. 1-2, 796 So.2d at 111. During the hearing on a motion to quash the indictment, there was conflicting testimony between defense and prosecution witnesses as to the existence of an agreement, and the trial court credited the defense witnesses over the prosecution witnesses "based on [the defense attorney]'s specific recall of his conversations with [the former district attorney] and the details of the agreement." **Id.**, 35,026 at p. 5, 796 So.2d at 113. Although the trial court did not discredit the testimony of the former district attorney (who did not recall making an agreement with the defense), the court noted that the district attorney had "handled thousands of cases, many of which involved some sort of agreement with defense counsel." **Id.** Because the finding

17

Given that we cannot say the district court erred in finding as a matter of fact that there was an agreement between the parties, the only remaining question is whether, in light of this agreement, the State was entitled to thereafter return to the grand jury to seek a second degree murder indictment against the defendant. Since such conduct would contravene the substance of the agreement as found by the district court, it would constitute either a withdrawal from, or breach of, the agreement.

As stated herein, the government may only withdraw from a plea agreement or an agreement not to prosecute if there has been no detrimental reliance, prejudicial to the substantial rights of the accused, and/or no evidence of devious practice by the government such as bad-faith negotiation designed to psychologically probe the defense or gain some other improper advantage. See **State v. Caminita**, 411 So.2d at 16. The defendant asserts that, although he did not relinquish his constitutional right against self-incrimination, his constitutional right to due process was violated by the fundamentally unfair conduct of the State, which he contends shocks the conscience, offends a sense of justice, and constitutes "prosecutorial misconduct."[10]

When a defendant enters into such a plea agreement (or agreement not to prosecute) with the government, the government takes on certain obligations. See **Puckett v. United States**, 556 U.S. 129, 137, 129 S.Ct. 1423, 1430, 173 L.Ed.2d 266 (2009). If those obligations are not met, the defendant is entitled to seek a remedy, which might in some cases be rescission of the agreement and in others specific performance (i.e., requiring the government to fully comply with the

---

of the trial court that the agreement existed had a rational basis in the evidence, it was not disturbed on appeal. **Id.**

[10] The State's arguments to this court focused only on denying that there was a binding agreement between the defense and the prosecution and asserting the untimeliness of the filing of the motion to quash, which will be discussed hereinafter.

agreement). See **Id.**; **Santobello v. N.Y.**, 404 U.S. at 263, 92 S.Ct. at 499. See also **State v. Louis**, 94-0761 at p. 11, 645 So.2d at 1150 ("Considerations of constitutional fairness generally come into play after the formation of an agreement not to prosecute and generally involve the performance of the defendant's obligations under the agreement.").

In this case, the defendant substantially complied with the terms of the agreement and detrimentally relied upon its provisions, as the appellate court dissent aptly summarized:

> The record established, in exchange for this push to get an indictment for Manslaughter, Defendant provided specific information regarding what witnesses would say, provided a specific list of witnesses and allowed his wife to testify without invoking her right to spousal privilege. By providing the list of witnesses and the key points of each witness['s] testimony, the defense gave the prosecution an advantage they would not otherwise have had when the matter was later brought back to a second grand jury. This information was only given based on the implicit understanding that both sides would be bound by the initial grand jury's determinations . . . .

**State v. Karey**, 180 So.3d at 513 (dissent).

Furthermore, the prosecution in this case did not establish any justification for withdrawing from the agreement, such as a breach of the agreement by the defendant or failure of cause.

In prior cases allowing the prosecution to withdraw from an agreement not to prosecute or from a plea agreement, the withdrawal was shown to be justified as the agreements were unenforceable for failure of cause unattributable to the prosecution, although certain statements made by the defendants in reliance on the existence of the agreements were deemed inadmissible in any subsequent trial of these defendants. See **State v. Lewis**, 539 So.2d at 1204-06 (wherein a plea agreement was ruled unenforceable for failure of cause, since the defense and the prosecution had bargained for something other than what they could actually

19

receive);[11] **State v. Nall**, 379 So.2d at 733-34 (wherein a plea agreement was nullified for a failure of cause when the defendant's statement, placing primary culpability on his co-defendant, proved to be false).[12]

However, in cases in which the prosecution failed to establish justification for withdrawal from an agreement with a defendant, specific performance (in the form of enforcement of the agreement) has been ordered. See **State v. Louis**, 94-

---

[11] In **State v. Lewis**, the defendant was charged with felony theft in Rapides Parish and entered into an agreement with the parish district attorney and federal prosecutor for the district, under which the defendant would give "full and complete cooperation" in an investigation of farm equipment thefts and a federal arson investigation, in exchange for reduction of the charge against him and the agreement that any information he provided or any evidence derived from such information would not be used against him. **State v. Lewis**, 539 So.2d at 1200. The State later withdrew from the agreement, contending the defendant was not cooperating in the arson investigation, and though the defendant had assisted in the recovery of two stolen tractors worth $260,000, he made statements implicating himself in the theft of these tractors, along with two small tractors in Avoyelles Parish. **Id.** Subsequently, charges were filed against the defendant in Avoyelles Parish, and the defendant filed a motion to suppress the information obtained through his statements made in the Rapides Parish investigation pursuant to his agreement with the Rapides Parish District Attorney. **Id.**, 539 So.2d at 1201. In ruling on the effect the Rapides Parish agreement had on the Avoyelles Parish prosecution, the court stated that the Rapides Parish agreement "can be dissolved for failure of cause, as both parties signed the agreement in the belief they had bargained for something other than what they were actually to get" (since the defendant provided evidence believing he would be immune from prosecution in other jurisdictions, a guarantee the district attorney had no authority to make, and the State believed information concerning an act of arson would be provided, about which the defendant contends he had no knowledge of). **Id.**, 539 So.2d at 1204. This court concluded there was a "failure of cause on both sides." **Id.** However, because incriminating statements were made by the defendant while acting under the agreement, which he believed gave him immunity from prosecution based on the information he provided, this court ruled that, "[u]nder the circumstances related, defendant's statements cannot be viewed as voluntary, thus, the information learned from them or any fruits of the information cannot be used in any subsequent prosecution." **Id.**, 539 So.2d at 1206.

[12] In **State v. Nall**, the defendant was charged with murder and entered into an agreement with the prosecutor agreeing to confess and also testify against a co-defendant (who the defendant said was his co-conspirator in a burglary and who shot and killed the victim during the burglary and then, at gunpoint, forced the defendant to also fire his weapon into the lifeless body of the victim), in exchange for a reduction of the charge to manslaughter and a sentence limited to ten years. **State v. Nall**, 379 So.2d at 732-33. In a subsequent statement, the defendant told the authorities that he had hired his co-defendant to assist him in killing the victim, who he said had been "romantically involved" with his wife, and they had ambushed the victim at his home, with the defendant firing the first shot. **Id.**, 379 So.2d at 733. The district attorney then withdrew from the agreement, and the defendant thereafter sought to either enforce the agreement or suppress any evidence disclosed under the agreement. **Id.**, 379 So.2d at 721-33. Because the cause for the State's agreement was the purported diminished culpability of the defendant's participation in the victim's murder together with his testimony implicating his co-defendant, such that when this information turned out to be false, this court ruled that the agreement between the parties "fell because of a failure of cause." **Id.**, 379 So.2d at 733. However, it was further held that the defendant's statement, made under the agreement, could not be viewed as voluntary, since when given the defendant believed the agreement would be honored; therefore, "information learned from the statement and any fruits of the information cannot be used in any subsequent prosecution of the defendant." **Id.**, 379 So.2d at 734.

0761 at pp. 12-13, 645 So.2d 1150-51 (wherein an agreement not to prosecute, in exchange for the defendant's cooperation with a federal drug enforcement agency, was found to be enforceable against the prosecution, who had withdrawn from, thus breaching, the agreement for a reason not proven at the hearing on the defendant's motion to quash the indictment);[13] **State v. Tanner**, 425 So.2d at 764 (wherein the defendant's bargain with the prosecution was enforced, when the prosecution failed to honor its agreement not to prosecute for negligent homicide if the jury returned a no true bill, in exchange for the grand jury testimony of the defendant and that of another defense witness);[14] **State v. Hingle**, 242 La. at 867-

---

[13] In **State v. Louis**, the defendant was facing a possession of cocaine charge when his attorney approached the prosecutor about the possibility of working out an immunity agreement in exchange for the defendant's information about drug sources in Houston, Texas. **State v. Louis**, 94-0761 at pp. 1-2, 645 So.2d at 1145. Although the parties agreed to immunity from prosecution for the cocaine possession, the prosecutor later withdrew from the agreement, maintaining the defendant had breached a condition not to engage in additional criminal activity, and the prosecution refused to provide documentation to the Drug Enforcement Administration ("DEA") that would have allowed the defendant to continue to cooperate in DEA investigations, instead obtaining a grand jury indictment against the defendant. **Id.**, 94-0761 at pp. 2-4, 645 So.2d at 1145-46. The defendant filed a motion to quash the indictment, and the trial court denied the motion, finding that, although there were preliminary steps toward an agreement, "there was never an agreement consummated." **Id.**, 94-0761 at p. 2, 645 So.2d at 1145. In denying the motion to quash, the trial court found that the prosecutor promised immunity for the defendant on these charges if the DEA accepted the defendant to work with the agency in Houston and if the defendant did in fact cooperate with the DEA. **Id.** The trial judge concluded there was no evidence that the defendant cooperated with the DEA or did anything to his detriment; the appellate court affirmed. **Id.**, 94-0761 at p. 3, 645 So.2d at 1146. On this court's review of the record, significant cooperation by the defendant with the DEA was evident and, in addition, the defendant had revealed incriminating information. **Id.**, 94-0761 at pp. 3-7, 645 So.2d at 1146-47. Further, this court concluded that the defendant performed under the agreement until prevented by the prosecutor. **Id.**, 94-0761 at pp. 12-13, 645 So.2d at 1150. Because of the defendant's performance and self-incrimination under the agreement and the prosecutor's failure to prove the asserted reason for breaching the contract, this court concluded that "there was no justification in this record for the prosecutor to refuse to complete the agreement himself or to refuse to allow defendant to fulfill his obligation" and ruled that the defendant was entitled to the immunity from prosecution promised under the agreement. See **Id.**, 94-0761 at pp. 13-14, 645 So.2d at 1150-51.

[14] In **State v. Tanner**, the defendant was charged with two counts of negligent homicide, after a vehicle he was operating struck another vehicle head-on, and two occupants of the other vehicle were killed as a result. **State v. Tanner**, 425 So.2d at 761. When a grand jury returned "not a true bill" as to the negligent homicide charges, the prosecution did not dismiss the bill of information. **Id.** The defendant then filed a motion to quash, asserting that the defense had entered into an agreement with the prosecution that, if the defendant and another defense witness testified before the grand jury and the grand jury returned a no true bill, there would be no further prosecution against the defendant; the prosecution denied making such a promise. **Id.**, 425 So.2d at 762-63. This court found that the evidence established a binding commitment by the prosecution and, in reliance upon that commitment, the defendant waived his fundamental right against self-incrimination before the grand jury. **Id.**, 425 So.2d at 763. This court held, "Absent prosecution for false statements or perjury, defendant obtained complete or transactional

68, 139 So.2d at 213 (wherein the defendant's plea bargain was enforced, upon a finding that the prosecution's reason for withdrawing was not valid).[15]

In the instant case, the prosecution failed to establish valid justification for withdrawing from the agreement with the defense, during the hearing on the motion to quash the indictment. Although former Assistant District Attorney Brett Sandifer made conclusory statements, during the hearing, that the investigation was ongoing at the time the matter was before the first grand jury, indicating there was a "phone issue we still had to resolve" and there were witnesses that law enforcement had not interviewed, those statements alone do not provide a substantive reason for withdrawing from the agreement not to prosecute. The State further intimated, in argument to this court, that additional investigation after the initial grand jury indictment for manslaughter produced new evidence, which tended to establish that the defendant may have planned his attack on the victim from a date and under circumstances that would indicate he did not commit the act in a "heat of blood," as required by La. R.S. 14:31(A).[16] However, no evidence was adduced during the district court hearing to substantiate those assertions.[17]

---

immunity from prosecution for these negligent homicides after the favorable verdict by the grand jury." **Id.**, 425 So.2d at 764.

[15] In **State v. Hingle**, the defendant was charged with the possession and sale of marijuana cigarettes, and his attorney entered into an agreement with the prosecution for his guilty plea to attempted possession, in exchange for a two-and-one-half-year sentence and the prosecution's agreement to dismiss all other charges and refrain from filing a multiple offender charge. **State v. Hingle**, 242 La. at 847-47, 139 So.2d at 205-06. The prosecution admitted the agreement, but contended that it was conditioned on the defendant not being convicted of another charge. **Id.** Finding that the evidence established that the agreement was unconditional, this court annulled the multiple offender sentence and reinstated the original sentence. **Id.**, 242 La. at 867-67, 139 So.2d at 213.

[16] Revised Statute 14:31(A) defines manslaughter, in part, as occurring when "the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection," but this statute also states that "[p]rovocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed."

[17] Further, we note that the work product provided by the defense to the prosecution, *prior* to the first grand jury submission, imparted information to the prosecution that could have cast some doubt on the defense contention that the defendant committed the September 27, 2013 murder in a "sudden passion" or "heat of blood," including: that the defendant was first apprised of a

Because the defendant performed under the agreement with the prosecution and the prosecution failed to show justification for withdrawing from the agreement, we conclude that the district court did not abuse its discretion in granting specific performance to the defendant in this case and quashing the second degree murder indictment.[18]

Reliance by District Court on **State v. Tanner** Concurring Opinion

The State and the appellate court criticize the reasoning of the district court in this case in, inter alia, relying on the concurring opinion in **State v. Tanner** (particularly the language stating that "our judicial system cannot countenance prosecutorial misconduct which puts an unwary defendant at an unfair disadvantage," and that "We cannot allow the state to enter into a supposed bargain which causes the defendant to reveal information not otherwise available to the state in carrying its burden of proving the defendant's guilt in a criminal prosecution, only to have the state renege on the deal once it discovers chinks in the defendant's tactical armor.").

However, the comments in the **State v. Tanner** concurrence are in accord with the principles announced in **State v. Caminita**, supra ("Absent any showing of detrimental reliance prejudicial to the substantial rights of the accused, **or** evidence of devious practice by the government such as bad-faith negotiation designed to psychologically probe the defense **or gain some other improper**

_____

relationship between his wife and the victim when he received a text message meant for his wife from the victim, on September 21, 2013 (six days before the murder); that the defendant's wife told him, by September 24 or 25, 2013 (at least two to three days before the murder), that the victim had stopped her while she was driving and raped her; and that the defendant and his wife made a police report about the rape during the week before the victim's murder.

[18] We note that, herein, unlike in **State v. Caminita**, 411 So.2d at 16 (wherein the only detriment claimed by the defense was that the defendant's hopes were raised as to a possible plea agreement, then those hopes were dashed when the defendant was informed that the district attorney had allegedly overruled his subordinate and repudiated the deal), the instant defendant affirmatively provided the prosecution with evidence, in the form of witness testimony, which gave the prosecution an advantage in its burden of proof to establish that the defendant was guilty of a more severe crime than the evidence presented in this case showed the prosecution was otherwise prepared to prove.

**advantage**, the government remains free to withdraw from a plea agreement up to the time the plea is entered.") (emphasis added), and in **State v. Louis**, supra ("Considerations of constitutional fairness generally come into play after the formation of an agreement not to prosecute and generally involve the performance of the defendant's obligations under the agreement."). See **State v. Louis**, 94-0761 at p. 11, 645 So.2d at 1150; **State v. Caminita**, 411 So.2d at 16. Therefore, we find no merit in the State's argument on this issue.

Timeliness of Motion to Quash

We find no error in the appellate court's refusal to consider the argument made by the State, re-urged in brief to this court, that the defendant's motion to quash was untimely filed (as filed under the dismissed manslaughter case number 26060-13) and not the subsequent second degree murder case number 17151-14). The appellate court ruled that, pursuant to Rule 1-3 of the Uniform Rules of Louisiana Courts of Appeal ("The Courts of Appeal will review only issues which were submitted to the trial court . . . ."), since the State did not raise the issue in the district court, it could not be considered on appeal. See **State v. Karey**, 15-0522 at pp. 4-5, 180 So.3d at 504. Although other preliminary matters were discussed in open court on the day of the January 6, 2015 hearing, no objection was raised about the timeliness of the motion to quash.[19] Therefore, we find no merit in the State's argument on this issue.

**CONCLUSION**

We conclude that the appellate court erred in overturning the district court's factual determination that there was an agreement not to prosecute between the

---

[19] In fact, even though the State was aware that the motion to quash had been filed under Fourteenth Judicial District Court Case No. 26060-13, rather than under No. 17151-14, prior to the district court hearing on the motion, as evidenced by the filing of its opposition to the motion to quash also under No. 26060-13, as well as by its passing remark in a separate opposition to an application for writ of habeas corpus (that "the State certainly does not agree that the filings under the 26060-13 case are appropriate . . . ."), no objection or argument was presented to the district court on the motion to quash on that basis.

defendant and the prosecution in this case, since there were was evidence in the record supporting the district court's factual findings that the defense and the prosecution had a common goal to obtain a manslaughter indictment from the initial grand jury and that there was an "understanding" or agreement between the parties that they would "live with" or be bound by the conclusion of that grand jury. See **State v. Thompson**; **State v. Wells**; **State v. Hunt**; supra. Further, because the defendant performed under the agreement, providing witnesses and attorney work product, as well as waiving the spousal privilege as to his wife's testimony before the grand jury, the prosecution gained an unfair advantage and could not thereafter withdraw from the agreement without a valid justification to withdraw, pursuant to the principles of fundamental fairness set forth in **State v. Caminita** and other jurisprudence cited. The prosecution did not prove it had a valid justification to withdraw from its agreement not to prosecute during the hearing on the motion to quash held in this case. Therefore, we conclude that, since there was no factual or legal error in the district court ruling, the district court did not abuse its discretion in granting the motion to quash the second degree murder indictment, and the appellate court erred in reversing the district court decision.

### DECREE

For the reasons stated, the judgment of the appellate court is reversed, and the district court judgment, granting the defendant's motion to quash and dismissing the second degree murder indictment, is reinstated. Further, the stay order issued by this court on August 31, 2016 is hereby lifted.

**APPELLATE COURT JUDGMENT REVERSED; DISTRICT COURT JUDGMENT REINSTATED; STAY LIFTED.**

# SUPREME COURT OF LOUISIANA

## No. 2016-K-0377

## STATE OF LOUISIANA

## VERSUS

## WOODROW KAREY, JR., A/K/A WOODROW KAREY, II

## ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, THIRD CIRCUIT, PARISH OF CALCASIEU

Guidry, J., dissents for the reasons assigned by Justice Clark.

**SUPREME COURT OF LOUISIANA**

**No. 2016-K-0377**

**STATE OF LOUISIANA**

**VERSUS**

**WOODROW KAREY, JR., A/K/A WOODROW KAREY, II**

**ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
THIRD CIRCUIT, PARISH OF CALCASIEU**

**Clark, Justice, dissents and assigns reasons.**

I respectfully dissent from the majority opinion for the reasons that follow. I do not see any rational basis in the record to support a finding that an agreement existed between the prosecutor and the defense that both would be bound by the charge returned by the first grand jury. The factual finding by the trial court to the contrary was based in part on two errors: 1) that the State believed manslaughter to be the appropriate charge and was only pursuing the second degree murder charge to eradicate "family problems" in a "high profile" case. (Transcript pp. 126-127) and 2) that the concurrence in *State v. Tanner*, 425 So.2d 760 (La. 1983) expanded the law regarding the enforcement of pre-trial agreements to those agreements that do not affect fundamental constitutional rights.

First, as the State points out, because there was a potential charge of second degree murder, which is punishable by "life imprisonment without benefit[s]", the matter was required to be presented to a grand jury. See La. R.S. 14:30.1(B) and La. Code Crim.P. art. 437. The repeated assertions by the prosecutors that they agreed to fairly present the case to the grand jury, then, was nothing more than a commitment by the State to do what the law requires it to do. The defendant's tendering of his witness list and a summary of the witnesses' testimony in exchange for the State's agreement to fairly present the case to the grand jury does

not amount to any sort of bargain. Rather, the agreement, which included a fair presentation of the defendant's case, was a professional courtesy, at most, and a simple adherence to the law, at a minimum. That the defendant *inferred* the State would not only fairly present the case to the grand jury, but would *also* be bound by the grand jury's charge, does not prove the existence of any such agreement. It only proves, perhaps, a hope or an unjustified expectation. A review of the record does not evidence any meeting of the minds to relinquish the opportunity to seek a more serious charge at a separate grand jury, which the law allows and no purported agreement prevented. This finding is bolstered by the lack of a plea deal or a written agreement not to prosecute.

While implicit in my finding that there was no agreement in the first place, I write additionally to expressly state I find no detrimental reliance, bad-faith negotiation, or prosecutorial misconduct. Instead, I find this case fits within the vast prosecutorial authority to charge offenses and fairly present the case to a grand jury, even convening multiple grand juries if the circumstances so warrant.

Second, the trial court committed legal error in relying on a concurring opinion in *Tanner, supra.* The *Tanner* majority found a defendant must give up a fundamental right as part of the bargain in order for the agreement to be binding. The concurrence expanded beyond the fundamental right requirement to include scenarios of "unfair disadvantage" and the disclosure of favorable information. This "principle of judicial integrity[,]" while laudable, is not the law as expressed by the *Tanner* majority or subsequent jurisprudence. Here, the defendant did not relinquish his right against self-incrimination by testifying nor did he forfeit any other fundamental right. Instead, he provided information that could have been discoverable by the State. Indeed, the defendant's wife was subpoenaed by the State and had an obligation to appear regardless of what the defendant's wishes

2

were about her testifying.  Thus, either under an abuse of discretion standard or a *de novo* standard of review for legal errors, I would affirm the ruling of the court of appeal, which reversed the trial court's grant of the motion to quash.

# SUPREME COURT OF LOUISIANA

## No. 2016-K-0377

## STATE OF LOUISIANA

## VERSUS

## WOODROW KAREY, JR. A/K/A WOODROW KAREY, II

## ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, THIRD CIRCUIT, PARISH OF CALCASIEU

**CRICHTON, J., dissents and assigns reasons:**

I dissent. The plurality opinion finds an enforceable agreement based on "evidence in the record upon which the district court could have ruled either that there existed an agreement between the parties or that there was no agreement between the parties." *State v. Karey*, 2016-0377, slip. op., at 17. But because the purported agreement at issue in this case was not reduced to writing,[1] this left a record revealing only loose chatter between the prosecutors and defense counsel. With that record, I believe the plurality opinion ignores missing elements of an enforceable agreement to abide by the first grand jury's decision.

Under these circumstances, I do not believe the feeble testimony of defense counsel alone adequately supports the trial court's finding of an enforceable

---

[1] "The party demanding performance of a contract has the burden of proving its existence." *State v. Givens*, 1999-3518, p. 15 (La. 1/17/01), 776 So.2d 443, 455 (holding defendant did not prove an enforceable agreement, only that there was some discussion of a plea bargain). Given the defendant's burden to prove the existence of the agreement, I find it bewildering that defense counsel chose not to contemporaneously memorialize the alleged agreement in writing. I believe a reasonable defense attorney would have, at the very least, issued an e-mail confirmation of any supposed agreement.

In finding this to be an enforceable agreement, the plurality opinion, in my view, ignores what could be a chilling effect on pre-trial discussions between district attorneys and defense attorneys, which would be to the detriment of all parties in the criminal justice system. Fortunately, as a plurality decision, its holding is on the more narrow grounds of the concurring justice. *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (internal quotations and citations omitted).

agreement, which requires a "meeting of the minds." *See Read v. Willwoods Cmty.*, 2014-1475, p. 5 (La. 3/17/15), 165 So. 3d 883, 887; *see also State v. Smith*, 452 So. 2d 160 (La. 1984) (remanding for a hearing to determine whether there was "a meeting of the minds between the defendant, the defense counsel, the prosecutor and the trial judge" as to a plea bargain). For instance, the State did not need to go before the grand jury to secure an indictment for manslaughter,[2] so it would have received no benefit from entering into such an agreement. Additionally, as part of this alleged agreement, defense counsel provided the State with a witness list and summaries of anticipated testimony, and facilitated the cooperation of the defendant's spouse. But most, if not all, of this information would be discoverable in advance of trial. *See* La. C.Cr.P. art. 725.1(B)(1). That there does not appear to be any rationale for the State to enter into such an agreement undermines the trial court's finding that there was an enforceable agreement.

The plurality opinion also fails to identify any fundamental right purportedly relinquished by this defendant, such as the privilege against self-incrimination. Under *State v. Tanner*, 425 So. 2d 760 (La. 1983), even if there was an agreement here, the State can withdraw from that agreement if the defendant has not relinquished a fundamental right in reliance upon it. *Id.* at 763. ("When a district attorney or assistant district attorney makes a good faith bargain with a person accused of a crime and defendant, in reliance on that bargain, relinquishes such a fundamental right as the privilege against self-incrimination, the state cannot repudiate the bargain."). In other words, under *Tanner*, if the defendant does not relinquish a fundamental right, then this is not an enforceable agreement.

---

[2] Because second degree murder is punishable by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, La. R.S. 30.1(B), the State was required to go before the grand jury. La. C.Cr.P. art. 437. An indictment for manslaughter, which carries a punishment of hard labor for not more than forty years, La. R.S. 14:31, does not need to go before the grand jury.

2

In sum, I would find the trial court abused its discretion in granting the motion to quash, reinstate the second degree murder indictment, and remand for further proceedings.